# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-3516

_____

BASCO, Inc., a Minnesota corporation,   *
                                   *

           Plaintiff/Appellant,   *

                                   *   Appeal from the United States

        v.                       *   District Court for the

                                   *   District of Minnesota.

Buth-Na-Bodhaige, doing business as   *

The Body Shop, a Delaware        *      [PUBLISHED]

corporation; The Body Shop, Inc.,    *

                                   *

          Defendants/Appellees.   *

_____

Submitted: October 21, 1999
Filed: December 9, 1999

_____

Before McMILLIAN, BRIGHT and FAGG, Circuit Judges.

_____

PER CURIAM.

Appellant BASCO, Inc. ("BASCO"), as a franchisee of appellees Buth-Na-Bodhaige, Inc., d/b/a The Body Shop, and The Body Shop, Inc. (collectively "The Body Shop"), has brought a multi-count civil action against the franchisor, alleging breach of contract, misrepresentations, breach of fiduciary duty, interference with business advantage, violations of Minnesota Statutes pertaining to discrimination between franchises and unreasonably withholding consent for transfer of a franchise (Southdale franchise). The district court granted summary judgment dismissing all

claims, and determined that a release of claims executed by BASCO on November 22, 1993 banned all claims save for withholding of consent to transfer the franchise. As to the latter claim, the district court determined such claim is without merit. After unsuccessfully seeking relief from the summary judgment under Rule 60(b) of the Fed.R.Civ.P., BASCO brought this timely appeal from the judgment. We reverse and remand.

## I.    BACKGROUND

The district court's memorandum order succinctly sets forth the background for this lawsuit:

> Plaintiff BASCO, Inc. ("BASCO") is owned by Barbara Schonwetter. In 1990, Schonwetter, interested in opening a Body Shop store, sent a letter to The Body Shop stating that she had obtained a masters in business administration, with a concentration in marketing and finance, and was interested in pursuing a Body Shop franchise. Based on this letter, The Body Shop sent Schonwetter the corporation's Uniform Franchise Offering Circular ("UFOC"). The UFOC specifically (1) reserved to The Body Shop the right to open or have others open a Body Shop store at any location outside the protected territory; (2) provided for training by The Body Shop as it deemed advisable; and (3) permitted The Body Shop to refuse to accept an assignment or transfer of the franchise if the transferee did not meet the then current standards for new franchisees.
>
> In July 1990, Schonwetter met with Ranjit Singh and David Edward, representatives of The Body Shop. During this interview, Schonwetter asserts that The Body Shop representatives told her that The Body Shop did not intend to place a shop in the Mall of America, nor open a store which would be adverse to her store. However, Schonwetter was informed that there was room in the Twin Cities for at least four stores and two franchises. In August of 1990, Schonwetter again interviewed with The Body Shop's representatives, wherein they

reiterated the conditions and expectations of obtaining a franchise. Schonwetter was then granted a Body Shop franchise.

Schonwetter selected the City Center for her franchise location. Schonwetter reviewed the UFOC with her attorney, and on September 11, 1990, executed the Franchise Compliance Certification. This certification provided among other things that Schonwetter: (1) had conducted an independent investigation of the franchise; (2) consulted with her lawyers and accountants; (3) had no assurance that any minimum number of additional franchised or company-owned stores would become operational; and (4) was not given, shown, or told anything inconsistent with the UFOC information. At the same time, Schonwetter executed The Body Shop's standard Franchise Agreement for the City Center. Important for the case at hand, the Franchise Agreement provided that (1) Schonwetter's protected territory was the City Center; (2) The Body Shop was permitted to open any store, or have others operate a Body Shop store, at any retail location outside the City Center; and (3) the relationship created between The Body Shop and Schonwetter was not a fiduciary relationship.

On October 1, 1990, after Schonwetter had trained with The Body Shop in New York, she opened the City Center store. Shortly thereafter, The Body Shop granted Denise DeNardi and Bruce Carter, a Body Shop franchise for the Rosedale Mall. Both parties, Schonwetter and DeNarter/Carter [sic] had also expressed interest in obtaining a franchise for the Southdale Mall. In the Spring of 1991, Schonwetter was granted the Southdale mall franchise. She received and signed a UFOC in connection with the Southdale franchise and executed a Franchise Compliance Certification and Franchise Agreement. The Southdale paperwork was comparable to the City Center documents she had previously signed. In August of 1991, Schonwetter opened the Southdale store. Despite Schonwetter's interest in obtaining a Mall of America franchise, approximately one year later DeNardi and Carter were awarded the Mall of America franchise. Because Plaintiff contests the Mall of America franchise being awarded to DeNardi and Carter, Plaintiff BASCO, Schonwetter's corporation, brings the present suit against Defendants . . . .

Addendum at 1-4 (citations omitted).

The parties entered into a release agreement on November 22, 1993 in connection with the sale of the City Center franchise to the franchisor, The Body Shop:

1.    Basco and Barbara Schonwetter Release.   Basco and Barbara Schonwetter, individually and on behalf of Basco, with the intention of binding itself/herself and its/her successors and assigns, do hereby remise, release and forever discharge, without limitation or observation, Buth, its personal representatives, successors, assigns, agents, employees, officers and directors, and each of them, and Buth's affiliates and their personal representatives, successors, assigns, agents employees, officers and directors, of and from any and all manner of action and actions, cause and causes of actions, suits, claims, demands, debts, dues, duties, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, arrangements, promises, representations, variances, trespasses, damages, judgments, decrees and demands of every nature, kind and description whatsoever, whether existing in law, equity or otherwise, which Basco and Barbara Schonwetter against Buth ever had, now has or which its/her successors or assigns can or may have from the beginning of the world to the date of the execution of this Release, relating to Buth, except for obligations under the Asset Purchase Agreement, and Bsurviving [sic] obligations under the Franchise Agreeement [sic] and any other franchise agreements between the parties.  Basco and Barbara Schonwetter for itself/herself and its/her respective agents, employees, successors and assigns, further covenants from the date of this Release forward never to institute, prosecute, commence, join in, attempt, assert or maintain any action against Buth or its personal representatives, successors, assigns, agents, employees, officers and directors on any claims released by this paragraph in any civil, criminal, or administrative proceeding, whether at law or in equity, in any court or tribunal.

Id. at 19.

The parties agree that the release terms applicable to "Buth" relate to "The Body Shop" and that the terms in brackets below apply to the parties as shown:

> [E]xcept for obligations under the Asset Purchase Agreement [respecting City Center], and Bsurviving [sic] obligations under the Franchise Agreeement [sic] [respecting City Center] and any other franchise agreements between the parties [i.e., Southdale].

Appellant's Br. at 9 (alterations in original) (emphasis omitted).

As to the refusal to consent to a transfer of the Southdale franchise, the district court wrote:

> BASCO, in an attempt to sell its Southdale franchise, found a potential buyer, Mark Johnson, a marketing executive with Pillsbury. BASCO and Mr. Johnson entered into a Purchase Agreement in which Mr. Johnson agreed to purchase the franchise for $210,000. Pursuant to the existing franchise agreement, they then submitted the Purchase Agreement to The Body Shop for approval. However, The Body Shop withheld its consent. Plaintiff argues that consent was withheld unreasonably.

> Defendants maintain, and Plaintiff does not contest, that upon submission of the Purchase Agreement, The Body Shop interviewed Mr. and Mrs. Johnson. During the interview, the executives of The Body Shop determined that the Johnsons had little retail experience, would not work full-time in the shop, did not have adequate financing, and would not complete the required Body Shop training. After allowing the Johnsons an opportunity to improve on these shortcomings, which they failed to do, Defendants withheld consent to the transfer.

Addendum at 11-12.

On this issue the appellant offered evidence from two experts who had examined the backgrounds of other franchisees whom The Body Shop had approved. The experts

concluded that appellant's proposed buyer possessed equal or superior qualifications to other franchise purchasers.

The provisions of the franchise agreement relating to a transfer of interest by the franchisee, while extensive, state that the "[f]ranchisor shall not unreasonably withhold its consent to a transfer . . . ." Appellant's App. at 254. Other provisions as summed up by the appellees' brief are as follows:

> The franchise agreement specifically provided that The Body Shop could reject any proposed transfer if the proposed transferee did not meet its then current standards, including the lack of retail experience, refusal to complete training and failure to devote full time to the business. (transferee must meet "Franchisor's then-current standards for new licensees in the System . . .") The only requirement was that The Body Shop not unreasonably withhold its consent to the transfer.

Appellees' Br. at 27 (citations omitted).

## II. DISCUSSION

### A. The Release.

The parties agree that the initial provisions of the general release serve to bar all claims of BASCO and the president of BASCO, Barbara Schonwetter, from every sort of claim existing at the time that the release was signed on November 22, 1993. The disagreement arises under the exception provision reading:

> [E]xcept for obligations under the Asset Purchase Agreement [which the parties agree applies to existing obligations that remain under the City Center franchise which was the subject of the repurchase], and Bsurviving [sic] obligations under the Franchise Agreeement [sic] [again referring to

the City Center franchise] and any other franchise agreements between the parties [referring to the Southdale franchise].

Addendum at 19.

The district court applied North Carolina law, which was the choice of law provision contained in the franchise agreement. The parties do not object to this choice of law, although it does not appear that the general law applicable to the construction of this agreement is any different in North Carolina than it would be under Minnesota law where the transaction was executed.

The district court, looking at the general release terms, concluded that "all claims are released except for any surviving obligation under the City Center franchise agreement and surviving obligations under the Southdale mall franchise agreement." Addendum at 9. With respect to the claims arising from the Mall of America opening in 1992, the court determined that because appellant signed the release in 1993, all of the Mall of America claims existed at the time of the release signing and that those claims would thereby be barred from litigation. The district court added: "[t]he 'surviving obligation' language pertains to the continuing obligations that Defendants owe to a franchisee, such as supplying stock. To interpret the 'surviving obligation' to also encompass existing causes of action when the parties signed the release would be nonsensical." Addendum at 10. Thus, on analysis, the district court's interpretation of the agreement applies the exception to future claims that might arise under the franchise between the parties relating to stock sales and the like.

The appellees echo this analysis by stating in their brief that "[t]here can be no dispute that the asserted claims are not surviving obligations as they all pertain to facts and obligations that existed prior to the date of the General Release." Appellees' Br. at 9. As we understand the position of the district court and the appellant, surviving obligations as used in the release do not mean existing obligations of the franchise from

–7–

the Southdale mall, but really apply only to "continuing or future obligations." Appellees' Br. at 16.

The flaw in this analysis comes about from the use of the term "surviving obligations." The term "surviving" has always meant to continue through a passage or circumstance. Black's Law Dictionary defines "survive" as "[t]o continue to live or exist . . . to live through in spite of . . . to remain alive . . . exist in force or operation beyond any period or event specified." BLACK'S LAW DICTIONARY 1446 (6th ed. 1990).

Under the usual meaning of surviving obligations, the appellant's claims arising from breach of contract and related claims occurring before the date of the release in November of 1993 could represent surviving obligations and would ordinarily be exempt from the release agreement.

At oral argument, the appellees suggested that the term "obligations" means obligations arising from buying and selling merchandise in the operation of the franchise and does not encompass obligations arising from a breach of contract or other allegedly actionable wrongs by appellees. This could be a possible construction of the agreement, but such a contention emphasizes that the agreement is an ambiguous one and not susceptible to a plain meaning of its wording so as to bar appellant's claims as a matter of law. An ambiguity exists where the language of a contract is fairly and reasonably susceptible to either of the constructions asserted by the parties. See Barrett Kays & Assocs., P.A. v. Colonial Bldg. Co. of Raleigh, 129 N.C. App. 525, 528, 500 S.E.2d 108, 111 (1998) (quoting Bicket v. McLean Sec., Inc., 124 N.C. App. 548, 553, 478 S.E.2d 518, 521 (1996)). Such is the case here. The contract is ambiguous because the relevant terms are susceptible to varying interpretations.

Accordingly, we hold the agreement is, at minimum, subject to further interpretation by the district court.[1] If no evidence discloses whether this release was intended to cover any claims arising from breach of contract and the other claims arising from the Southdale franchise, the release agreement will have to be interpreted against the preparer, which in this case was the appellees, The Body Shop. Ambiguity in a written contract is construed against the party who prepared the instrument. Wachovia Bank & Trust Co. v. Medford, 258 N.C. 146, 149, 128 S.E.2d 141, 143 (1962).

Thus, we vacate the summary judgment of dismissal in favor of the appellees on the breach of contract and related claims arising from the Southdale franchise prior to the date of the release on November 22, 1993.

## B.      Transfer of Southdale Franchise.

We next turn to the grant of summary judgment in favor of The Body Shop on its refusal to consent to BASCO's transfer of the Southdale franchise to a prospective

---

[1]The objective of contract construction is to arrive at the intent of the parties at the time the parties entered into the contract. See Glover v. First Union Nat'l Bank of N.C., 109 N.C. App. 451, 456, 428 S.E.2d 206, 209 (1993). If the immediate context in which the words are used is not clearly indicative of the meaning intended, a court may look to other portions of the contract, Peirson v. American Hardware Mut. Ins. Co., 249 N.C. 580, 583, 107 S.E.2d 137, 139 (1959), and other extrinsic evidence that can shed light on the parties' intentions, Runyon v. Paley, 331 N.C. 293, 305, 416 S.E.2d 177, 186 (1992). When the language of the contract is ambiguous, and the court must construe the instrument by resorting to extrinsic evidence, the question of the parties' intention becomes one of fact. See Runyon v. Paley, 331 N.C. at 305, 416 S.E.2d at 186; Farmers Bank v. Michael T. Brown Distribs., 307 N.C. 342, 347, 298 S.E.2d 357, 360 (1983) (finding that parties' intention must be determined by trier of fact); Glover, 109 N.C. App. at 456, 428 S.E.2d at 209 (if contract is ambiguous, interpretation is for the trier of fact).

buyer. On this issue, BASCO presented substantial testimony to present a fact question as to whether or not The Body Shop unreasonably withheld its consent to a transfer.

Rholan Larson, a certified public accountant, compared the franchise application of the Johnsons, the prospective purchaser, to the franchise applications of fourteen franchisors who were approved by The Body Shop. According to this witness, the Johnsons had greater financial ability than the majority of the applicants. The record similarly reveals that a lack of retail experience and inability to work in the store full-time had not prevented The Body Shop from approving other applicants. The evidence from Barbara Schonwetter as well as other evidence from Denice DeNardi, who operates other franchises for The Body Shop in the Minneapolis area, indicated that full-time experience in the store did not constitute a necessary prerequisite for obtaining a franchise.

We need not detail the evidence but believe there is sufficient evidence so that a jury will have to determine whether or not the consent was withheld unreasonably.

Accordingly, we reverse the summary judgment of dismissal and remand this case for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.